UNITED FIRE & CASUALTY COMPANY, Appellant, v. PALMER-RITCHIE POST NO. 153, of the American Legion Department of Wisconsin, and another, Respondents.

*No. 146. Submitted October 2, 1973.—Decided November 12, 1973.*
(Also reported in 211 N. W. 2d 624.)

For the appellant the cause was submitted on the brief of *Frank M. Coyne* of Madison.

For the respondents the cause was submitted on the brief of *Chambers, Nash, Pierce & Podvin,* attorneys for respondent Lions Club of Pittsville, Wisconsin, and *Crowns, Merklein, Midthun & Hill,* attorneys for respondent Palmer-Ritchie Post No. 153, of the American Legion Department of Wisconsin, and *William A. Metcalf* of counsel, all of Wisconsin Rapids.

ROBERT W. HANSEN, J. Everybody loves a parade, and especially the folks around Pittsville, Wisconsin. Five to ten thousand persons turned out for the annual Fourth of July street parade and park celebration. The unfortunate incident that marred the event in 1968 was the breaking away of the mare, Dusty, from her rider, Larraine, fifteen minutes after the horse had finished its parading and after it had been tethered to a tree. When a horse with whom it had paraded was being led away and while her bridle was being replaced with a halter, Dusty bolted and ran injuring Sharon Hiles, one of the persons in the park.

The personal liability insurance carrier for the owner of the horse paid the injured person's claim for damages, and here sought contribution from the Legion post and Lions Club that had jointly sponsored the parade and Fourth of July observance. Defendants concede that they "owed a duty of ordinary care to the public at large

in the manner they conducted the parade." [1] Plaintiff insurance company sees such duty of ordinary care violated in three particulars:

*Duty to check.* Plaintiff claims the jury could have found that the defendants failed to properly check the horses before the parade. The parade chairman testified he grew up on a farm, still lives on a farm and currently owns three horses. He testified he lined up the units and would take a horse out of the parade if he or his assistant felt the horse was not fit to be in the parade. This was a taking of reasonable precautions against obviously uncontrolled or uncontrollable horses participating in the parade. Plaintiff appears to suggest a more intensive inspection that would determine which horses were in heat, or about to become so. The horse's owner, who had owned Dusty for four years, testified the only way to tell that Dusty was in heat was by her nervous or restless behavior. There is no evidence to suggest that an inspection before the parade would have revealed that Dusty would become nervous and restless fifteen minutes after her parading had ended. Where the horse was well under control and behaved properly before and during the parade, any failure to conduct a more extensive inspection here could not have been negligence. (The owner and rider of the horse testified Dusty had been in other parades and that there had never been any previous incidents or problems with the horse.) The trial court held that it is ". . . undisputed that there was no reason to anticipate or believe that the Ruesch horse was going to act up or become uncontrollable. This all happened after the parade had ended and after they were—the

---

[1] *See:* 4 Am. Jur. 2d, *Amusements and Exhibitions,* p. 168, sec. 52; p. 199, sec. 76; 3 C. J. S., *Agriculture,* pp. 395, 396, sec. 14 (b). *See also: Eide v. Skerbeck* (1943), 242 Wis. 474, 480, 8 N. W. 2d 282, dealing with duty of circus company to keep circus grounds, to which it invited the public and over which it exercised control, safe for the attending public.

horses were tied in the park," and found no issue as to duty to inspect to go to the jury. We agree.

*Duty to corral.* Plaintiff claims the jury could have found that the defendants failed to provide an enclosure for horses in the park. It is suggested that a "roped-off area" would "probably be sufficient." Or, it is suggested by plaintiff, "[j]ust a simple snow fence would serve as a suitable enclosure." There is no basis suggested for believing that a group of horses free to wander in a roped-off or snow fence-enclosed area would be as securely immobilized as having each separately tied to a tree. The improvised corral would be placed by plaintiff in the city park, a site not under the complete control or supervision of the defendants. Moreover, the horse riders were free to come to the staging area as they pleased. When their parading was over, they were free to leave. If, instead of leaving for home, an individual rider elected to secure his horse and join the celebration in the park, that was an individual decision in which the sponsors of the parade were not involved and for which they were not responsible. Nor do we see any duty to provide an attendant who would "supervise and control the animals in the park." Defendant advertised for horses and riders who were willing to participate in the street parade. When an individual horse and rider completed their parading, their volunteered and uncompensated relationship to the sponsors of the parade was at an end. What they did then was no part of the street parade or its sponsors. The trial court held that ". . . even if they had a facility to sequester the animals and provide an attendant, there is no reason—there is no indication in the evidence that such a situation would have prevented the act in question." We stop shorter to hold that there was no duty on the part of the sponsors of the parade to provide enclosure or attendant for horses that had completed their participating in the parade.

We agree that there was no issue as to breach of such duty to go to the jury because there was no such duty.

*End of parade route.* Plaintiff claims the jury could have found that the parade continued through the park. The parade chairman testified that the street parade ended at the entrance to the park. However, it appears that some floats, horses and parade participants continued on the roadway through the park instead of turning aside at the entrance to the park. The implied basis of plaintiff's position is that it was negligent for the parade sponsors to include a roadway through a park as part of a parade route because "there were hundreds of people" in the park. But there were thousands of watchers as the parade made its way through the streets of the small community. There may be reasons why a parade is somehow more dangerous when routed over a roadway in a park instead of solely on city streets. But they do not come to mind and, more important, they are nowhere in this record. Moreover, no matter where the parade route led, the accident here involved took place fifteen minutes after Dusty had finished parading and after she had been tied to a tree. The question is not whether the parade had ended or where it ended. The undisputed fact is that for Dusty and her rider the parade had ended fifteen minutes before the accident. The trial court held that "the parade had ended prior to the time that the horse became unruly at all." As far as Dusty's part in it is concerned, that is clearly true, and we agree that there was no issue as to the location or termination point of the parade route to go to the jury in this case.

Thus, we agree with the trial court that there was no issue to go to the jury and uphold the court's granting of defendants' motions for a directed verdict.

*By the Court.*—Judgment affirmed.